UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SK GREENWICH LLC,

                             Plaintiff,         10 Civ. 7846 (RPP)

         - against -               **OPINION AND ORDER**

W-D GROUP (2006) LP

                             Defendant.
------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.:**

      Plaintiff SK Greenwich LLC ("SKG") moves for a temporary restraining order and preliminary injunction pursuant to Fed. R. of Civ. P. 65 staying the sale of SKG's membership interest in 443 Greenwich Partners, LLC ("443 Partners"), and enjoining Defendant, W-D Group (2006) LP ("W-D Lender") from selling or otherwise disposing of SKG's membership interest. For the reasons explained below, Plaintiff's motion is denied.

## BACKGROUND

      Plaintiff SKG is a Delaware limited liability company controlled by its principal and sole owner, Shahab Karmely, a New York City real estate developer. (Def. Mem. in Opp. at 3, Pl. Mem. in Supp. at 2.) Defendant W-D Lender is a Delaware limited liability company controlled by Eitan Wertheimer and Ezra Dagmi, Israeli investors. (Def. Mem. in Opp. at 3.) In September 2006, Karmely and the principals of W-D Group NY1 LLC ("W-D1"), an affiliate of Defendant W-D Lender, agreed to form 443 Partners to purchase and develop the property at 443 Greenwich Street, New York, New York ("the Property"), for the purpose of converting it to luxury condominiums and a hotel. (Pl. Mem. in Supp. at 2.)

443 Partners purchased the Property for $113 million plus closing costs. (Def. Mem. in Opp. at 3.) In order to fund the purchase, 443 Partners secured an $85 million mortgage loan from Anglo Irish Bank Corporation PLC ("AIB"). (Id.) 443 Partners also contributed approximately $24.9 million of the purchase price, with W-D1 funding approximately $19.9 million of this amount and SKG funding the other $5.0 million through equity investment in 443 Partners.[1] (Id. at 3-4.) In exchange for W-D1's capital contribution, it obtained an 80% membership interest in 443 Partners, and in exchange for SKG's contribution, it obtained a 20% membership interest. (Pl. Mem. in Supp. at 2.)

On or about September 7, 2006, SKG, W-D1 and W-D Lender entered into a Mezzanine Loan Agreement (the "Mezzanine Loan") dated September 7, 2006, pursuant to which W-D Lender loaned $20,000,000.00 to SKG and W-D1. (Id. at 3.) The Mezzanine Loan was subordinate to the AIB mortgage, but senior to the equity investments of SKG and W-D1. (Def. Mem. in Opp. at 4.) The Mezzanine Loan is evidenced by a promissory note (the "Note") dated September 7, 2006. (Karmely Aff., Exs. 1-2.)

The Operating Agreement for 443 Partners governs the management and operation of the project, and provides for a three-person board of managers. (Karmely Aff., Ex. 3.) W-D1, as the 80% interest holder, has the right to appoint two of the three board members, and SKG has the right to appoint the third. (Id. at §6.1(a).) The Operating Agreement also provides that SKG would act as the Operations Member responsible for the day-to-day operations of the Property. (Id. at §6.1(c).) In that role, SKG stood to receive additional fees if the project succeeded. (Id.)

Under the terms of the Mezzanine Loan, W-D1 and SKG each pledged 100% of their ownership interests in 443 Partners as collateral for the loan. (Karmely Aff. Ex. 2 at 1.)

---

[1] The balance of the purchase price, $3.1 million, apparently came from the proceeds of the Mezzanine Loan.

Therefore, upon an "Event of Default," SKG and W-D1 are jointly and severally liable for the entire balance of the Mezzanine Loan, and W-D Lender has the right to foreclose on 100% of either or both borrowers' equity interests in 443 Partners. (Karmely Aff., Ex. 1 at §4.26(h), Ex. 2 at ¶7.)

To date, 443 Partners has been unable to secure a construction loan to pay off the Mezzanine Loan and begin renovations on the Property. (Def. Mem. in Opp. at 4.) The Property is currently vacant, is not undergoing renovations, and is not currently generating any income. (Id.) Over the past four years, 443 Partners has accumulated losses of approximately $17.4 million. (Dagmi Decl. at ¶ 11.)

On September 30, 2010, W-D Lender sent a letter to SKG, informing SKG that "the maturity date of the [Mezzanine] Loan was October 1, 2009, (the "Maturity Date") and the principal amount of the Loan in the amount of $20,000,000, plus accrued interest in the amount of $7,459,999 was due on the Maturity Date and was not paid by the Borrower." (Karmely Aff., Ex. 6.) On October 4, 2010, W-D Lender sent a letter to SKG informing SKG of its intent to sell the 20% membership interest owned by SKG in 443 partners at a public auction to be held on October 20, 2010. (Karmely Aff., Ex. 7.) W-D Lender also ran advertisements in the NEW YORK TIMES, on October 10, 13, and 15, 2010, and in the WALL STREET JOURNAL on October 13, 2010, announcing the sale. (Gellman Aff., ¶5.)

On October 12, 2010, Plaintiff filed a complaint in New York State Supreme Court seeking a declaratory judgment that SKG is not in default of its obligations under the Mezzanine Loan Agreement, Promissory Note or Pledge Agreement, and that pursuant to the agreements there is no event of default and no money due under the Note until i) payments to the Lender are permitted under the Senior Loan Documents, and ii) there is Available Net Cash Flow or Capital

Events Proceeds, as defined in the Operating Agreement, and an order barring W-D Lender from selling SKG's membership interest. On October 14, 2010, Defendant removed the case to this Court. On October 15, 2010, Plaintiff filed an Order to Show Cause in this Court as to why a preliminary injunction and temporary restraining order should not be entered in its favor. Defendant submitted a Memorandum in Opposition on October 15, 2010, and on October 18, Plaintiff submitted a reply. Argument was heard on the motion on October 19, 2010.

## DISCUSSION

I. Standard for Issuing a Preliminary Injunction

In this Circuit, a party seeking a preliminary injunction must show: "(1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008). "Because the purpose of a preliminary injunction is to prevent litigants from taking actions that they are otherwise legally entitled to take in advance of adjudication on the merits, they should be issued cautiously and in accordance with appropriate safeguards." Payment Alliance Intern., Inc. v. Ferreira, 530 F. Supp.2d 447, 480 (S.D.N.Y. 2007). Regardless of the applicable standard, the movant bears the burden of proving that an injunction is warranted. Citibank, N.A. v. Cititrust, 756 F.2d 273, 275 (2d Cir. 1985).

II. Irreparable Harm

In addressing the first prong of the requirements for the issuance of a preliminary injunction, the court must "actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits." Morgan Stanley & Co., Inc. v. Seghers, 2010 WL 3952851, at *5 (S.D.N.Y. Oct. 8, 2010). A showing of irreparable harm is the

...

"single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transport Malmo AB v. Wabtec. Corp., 559 F.3d 110,118 (2d Cir. 2009). To demonstrate such harm, a plaintiff must show that "absent a preliminary injunction, they will suffer an injury that is neither remote nor speculative, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007). To constitute irreparable harm, an injury must "be one incapable of being fully remedied by monetary damages." Reuters Ltd. v. United Press Int'l Inc., 903 F.2d 904, 907 (2d Cir. 1990).

Plaintiff asserts that it will be harmed because its membership interest in 443 Partners will be rendered worthless, because no buyer will want to purchase its minority interest, thereby allowing W-D1 to obtain a 100% interest in 443 Partners for an amount far below SKG's investment, and because SKG will lose its interest in the Property. (Pl. Reply Mem. at 3-4.) Plaintiff contends that because the Property is unique, it will be impossible for SKG to be compensated by a suit for damages. (Id. at 4.) Plaintiff asserts that there is no dollar amount that can compensate it for the loss. (Pl. Mem. in Supp. at 11.)

Defendant asserts that Plaintiff cannot show it will suffer any harm if relief is denied, because Plaintiff's interest in 443 Partners is currently worthless or of nominal value, a fact that Plaintiff concedes. (Def. Mem. in Opp. at 17, Pl. Mem. in Supp. at 2, n.1.)

Whether the loss of the Property can create irreparable injury is a fact-sensitive inquiry. See Medgar Evers Houses Associates v. Carro, 01 Civ. 6107, 2001 WL 1456190 at *4 (E.D.N.Y. Nov. 6, 2001). Plaintiff asserts that under Carpenter Technology v. City of Bridgeport, 180 F.3d 93, 97 (2d Cir. 1999), the loss of its interest in the Property is an irreparable harm as a matter of law. Carpenter Technology pertains to condemnation under Connecticut law, and is not

applicable to this case.  Here, Plaintiff's interest in the real estate is commercial, and the harm it fears is the loss of its investment, as opposed to loss of its home or a unique piece of property in which it has an unquantifiable interest.  Losses of interest in real estate are ordinarily compensable by damages, and do not necessarily amount to an irreparable harm as a matter of law.

   Plaintiff contends that its membership interest is equivalent to a right to participate in corporate management, and that the deprivation of such a right constitutes irreparable harm under Import Sales Company, LLC v. Labatt Brewing Company Limited, 339 F.3d 101, 115 (2d Cir. 2003).  Labatt concerned an ongoing joint venture and a dispute regarding the minority owner's rights to participate in the joint venture's management of competing interests in the US distribution and marketing of beer.  The court in that case found that the minority owner's veto power and right to participate have extrinsic value because such rights protect the balance of power between the majority and minority owners.  Id. at 114.  The facts in Labatt are distinguishable, in that the development project at issue here has not proceeded for four years, and as a result of the owners' failure to pay the note when it became payable, the parties will not have an ongoing business relationship moving forward, as explained in the opposing Declarations of Ezra Dagmi and Shahab Karmely.  The banks approached by the parties to provide financing for the renovation dropped out in 2008 and no other financing is stated to be available. (Karmely Decl. at ¶¶ 31-44.) After more than four years of delays in financing the proposed development and no prospect in site, W-D Lender wants to sell the Property.  (Dagmi Decl. at ¶¶ 12-15.)  Plaintiff, the 20% owner, disagrees and wants to continue to pursue the project.  (Karmely Decl. at ¶ 13.) It is true, that by the sale of the Property, Plaintiff will be losing its control over the ultimate fate of the Property in which it has invested substantial time

and resources. While its loss of the value of the investment might be compensable by damages, it is not clear, under Labatt, that Plaintiff's loss of control in the management of the Property does not constitute irreparable harm. Nonetheless, Plaintiff has not established its entitlement to a preliminary injunction.

   III. Likelihood of Success on the Merits

Plaintiff's motion fails because it has not demonstrated a sufficient likelihood of success on the merits of the case, or sufficiently serious questions going to the merits to make them a fair ground for litigation, with the balance of hardships tipping decidedly in movant's favor. Plaintiff contends that it is not in default under the Mezzanine Loan Agreement because no payment is presently due under Section 3.1(a) of the Agreement. (Karmely Aff., Ex. 1 at §3.1.) Section 3.1 of the Mezzanine Loan Agreement states that "'Event of Default' means the occurrence of any one or more of the following events." (Id.) This definition is followed by a list of events. Section 3.1(a) identifies one Event of Default as:

> "[T]he failure by the Borrower to pay any installment of principal, interest, or other payments required under the Note when due, provided however that at the time such payment is due (i) payments to the Lender are permitted under the Senior Loan Documents, and (ii) there is Available Net Cash Flow or Capital Events Proceeds (as defined in the Operating Agreement of 443 Partners)."

Plaintiff contends that under this section, there are no payments presently due because payments are not permitted until the Senior Loan from AIB is paid in full, and therefore Borrower's failure to pay the Lender is not a default under the Mezzanine Loan Agreement. (Pl. Mem. in Supp. at 4-6.) Plaintiff further contends that because 443 Partners has no available net cash flow or capital events proceeds, it is not in default. (Id. at 4.)

Defendant responds that Plaintiff is in default under the Promissory Note, the Pledge and Security Agreement, and the Mezzanine Loan Agreement. (Def. Mem. in Opp. at 9.) The

7

Promissory Note states in its first paragraph that on the Maturity Date, October 1, 2009, "the balance of principal, and the accrued and unpaid interest then remaining unpaid shall become due and payable." (Karmely Aff., Ex. 2 at 1.) Defendant contends that Plaintiff's failure to pay the balance of principal and interest by this date constituted a default. (Def. Mem. in Opp. at 9-10.) Defendant points out that the Pledge and Security Agreement explains that the Promissory Note calls for the "repayment of the principal sum evidenced by said note on or before October 1, 2009" (Karmely Aff., Ex. 4 at 1), and that in addition, the Pledge and Security Agreement includes among the "Covenants of the Pledgor," a commitment "to pay or satisfy all of the obligations." Id. at ¶ 4. Defendant further contends that Plaintiff is in default based on Section 3.1(c) of the Mezzanine Loan Agreement which provides that "failure by the Borrower…to observe or perform any agreement, covenant, or obligation" contained in "any Loan Document," constitutes an Event of Default. (Karmely Aff., Ex. 1 at §3.1(c).) "Loan Document" is defined by the Mezzanine Agreement to include the Promissory Note and the Pledge and Security Agreement. (Id. at §1.2.)

Under Plaintiff's interpretation of the Mezzanine Agreement, it is under no responsibility to make payments on the Mezzanine Loan until the Senior Lender is paid and the Property generates cash flow or proceeds. According to Plaintiff's interpretation, the drafters of the Mezzanine Loan and related documents did not contemplate that the real estate market would founder and the project would fail to go forward, and therefore failed to include any provisions ultimately requiring payment of the Note upon maturity in the event that any payments were still due to the Senior Lender or the Property had failed to generate Available Net Cash Flow. A review of the documents, however, demonstrates that not to be the case.

Section 4.26 of the Mezzanine Agreement, which Plaintiff failed to cite, is headed "General Conditions," and states the following: "Nothing in this Agreement or in the Note shall affect the obligation of the Borrower to pay the Debt in the manner and place therein respectively expressed." (Id. at §4.26(c).) The term "Debt," although capitalized, does not appear to be defined in the Mezzanine Agreement, but is defined in the Promissory Note, as the "principal balance due" on the Note. (Karmely Aff., Ex. 2 (the Note) at ¶ 1(a).) The Debt, therefore, is the $20,000,000.00 loan evidenced by the Note, on which interest was agreed to be paid "until October 1, 2009…when the balance of principal, and the accrued and unpaid interest then remaining unpaid shall become due and payable." (Id. at 1.) The understanding that the Debt on the Promissory Note was due upon maturity (October 1, 2009) is further reflected in Paragraph 4 of the Note, which explains that:

> "Upon the occurrence of any one of the events of default set forth in this Note and the Pledge, <u>or upon maturity of the Debt</u> and upon the Lender exercising its option to declare the Debt immediately due and payable by reason thereof or upon maturity of the Debt, the Borrower will continue to pay, from the date of the event, interest at the rate of 12% per annum, compounded annually." (emphasis added).

Thus, the Note states that upon the maturity of the Debt, the Lender can declare the Debt immediately due and payable, in which case the consequences are the same as in the event of default. As the Mezzanine Agreement prescribes that "the Borrower will pay the Debt as provided in the Note," (Karmely Aff., Ex. 1 at §2.1) and defines an Event of Default to include a the failure of the Borrower to perform any obligation under any of the Loan Documents (Id. at §3.1(c)), the failure of Plaintiff to pay the balance of the Debt by October 1, 2009, is indeed a default on the Mezzanine Loan.

The Loan Documents therefore eliminate the uncertainty created by Plaintiff's interpretation, whereby no payment of the Debt is ever required unless no payments are due under the Senior

9

Loan and the Property generates positive cash flow.  Defendant suggests that the exceptions to payment requirements created by Section 3.1(a) of the Mezzanine Agreement apply only to installment payments, and were intended to "give the borrowers breathing room and a reasonable opportunity to secure a construction loan."  (Def. Mem. in Opp. at 13.)  The General Conditions, however, limit that breathing room to three years from the date of the Note.  It seems clear that agreement contemplated the eventual payment of the Debt by the borrower, even in the event that the Property did not generate Available Net Cash Flow or the Senior Loan remained to be paid.  Therefore, the provisions of the Mezzanine Agreement, Note, and Pledge Agreement clearly establish the Defendant's right to sell the Plaintiff's interest in the Property.

Accordingly, Plaintiff has not raised significant questions on the merits.  Plaintiff has also failed to show the balance of equities tips decidedly in its favor.  Plaintiff's Reply Declaration of Shahab Karmely, dated October 18, 2010, alleges facts regarding the history of 443 Partners' efforts to develop the Property.  According to the Declaration, since 2006, Mr. Karmley has spent a substantial amount of time trying to secure construction financing for the renovation and conversion of the Property.  (Karmely Decl. at ¶¶ 31-43.)  In May 2008, Mr. Karmely obtained a financing proposal from Pacific National Bank, which was rejected by Mr. Wertheimer and Mr. Dagmi in favor of obtaining financing from UBS.  (Id. at ¶ 33.)  Mr. Karmely then met with representatives from UBS in the United States and in Switzerland.  (Id. at ¶ 35.)  UBS ultimately offered financing on terms that Mr. Wertheimer and Mr. Dagmi found to be unacceptable.  (Id. at ¶ 36.)  The offer from Pacific National Bank expired in the interim.  (Id. at ¶ 39.)  In addition to his efforts to obtain financing, Mr. Karmely has invested a total of about $9.2 million dollars in the project.  (Id. at ¶ 4.)

Defendant's Declaration of Ezra Dagmi, dated October 15, 2010, states that W-D1 and W-D Lender have contributed $72 million to the project. (Dagmi Decl. at ¶ 7.) Mr. Dagmi asserts that due to 443 Partners' inability to finance the development of the Property, it has not been renovated, remains vacant, and is not generating any income. (Id. at ¶ 10.) Mr. Dagmi's Declaration also states that 443 Partners has accumulated losses of approximately $17.4 million. (Id. at ¶ 11.) Mr. Dagmi claims that SKG has obstructed all efforts to sell the property since 2009. (Id. at ¶ 12.) W-D1 made a $16 million loan to 443 Partners to pay down the AIB mortgage, and repayment of this loan has priority over any distributions to SKG. (Id. at ¶ 13.) Therefore, according to Mr. Dagmi's Declaration, were the Property to be sold for its current market value, SKG would likely receive little or none of its investment, while AIB and W-D Lender, whose interest is unencumbered, could still recover significant value. (Id.)

In order to establish eligibility for a preliminary injunction based on the balance of the equities, Plaintiff would need to demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008). As discussed earlier, Plaintiff has not raised sufficiently serious questions going to the merits. It also has not shown that the balance of hardships tips decidedly in its favor. The fact remains that W-D1 is the 80 percent owner of 443 Partners, and that, together with W-D Lender, it has contributed substantially more in loans and equity contributions to the Property than SKG's $9.2 million contribution, which has been encumbered by W-D1's pay down of the AIB mortgage. The property is sitting vacant and 443 Partners is currently generating losses. According to Mr. Karmely, no proposals for construction financing have materialized since 2008, demonstrating that there is little prospect at present for the renovation of the Property to begin any time in the

near future. In addition, no payments have been made on the Mezzanine Loan, and only $16 million of the $85 million AIB mortgage has been paid. Should the Property continue to remain vacant and generate losses, Defendant will suffer ongoing harm. The balancing of the equities does not demonstrate that the hardships to SKG are decidedly greater than those suffered by Defendant if it is prevented from enforcing its rights under the Loan Documents.

## CONCLUSION

While Plaintiff might be able to demonstrate that it would suffer irreparable harm resulting from the sale of its interest in a commercial real estate property, it has failed to show that it has a likelihood of succeeding on the merits, or that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor. Therefore, Plaintiff's motion is denied.

IT IS SO ORDERED.

Dated: New York, New York
       October 21, 2010

*[signature]*

Robert P. Patterson, Jr.
U.S.D.J.

12

**Copies of this order were faxed to:**

**Attorneys for Plaintiff**

Edward S. Bloomberg
John J. Giardino
Keith M. Brandofino
Phillips Lytle
437 Madison Avenue, 34th Floor
New York, NY 10022
Tel.: (212) 759-4888
Fax: (716) 852-6100

**Attorneys for Defendant**

Stephen R. DiPrima
Bradley R. Wilson
Wachtell, Lipton, Rosen & Katz
51 W. 52nd Street
New York, NY 10019
Tel.: (212) 403-1000
Fax: (212) 403-2000